**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CAPSTONE ASSOCIATED SERVICES, LTD., Plaintiff, | No. 21-913 |
| v. | Filed: September 25, 2026 |
| THE UNITED STATES, Defendant. | |

**OPINION AND ORDER**

Plaintiff Capstone Associated Services, Ltd. ("Capstone"), by and through Capstone Holdings Corp., Tax Matters Partner, contests the Internal Revenue Service's ("IRS") Notice of Final Partnership Administrative Adjustment ("FPAA") dated November 13, 2020, which disallowed $239,773 in insurance premium expense deductions claimed by Capstone for the 2016 tax year and imposed accuracy related penalties amounting to 20 percent of the alleged underpayment. Before the Court is Capstone's Motion for Summary Judgment. Capstone argues that the undisputed facts establish that the payments constitute insurance premiums, entitling Capstone to judgment as a matter of law. The Government contends that genuine issues of material fact, as well as questions of evidentiary weight and credibility, preclude summary judgment. For the following reasons, the Court **DENIES** Capstone's Motion for Summary Judgment.

## I. BACKGROUND

### A. Captive Insurance Transactions Generally

Businesses generally may deduct insurance premiums from their taxable income as ordinary and necessary business expenses. *See* I.R.C. § 162(a); Treas. Reg. § 1.162-1(a). Businesses may not, however, deduct money set aside in reserves to pay for a business's expected

losses—*i.e.*, self-insurance. *See, e.g.*, *Clougherty Packing Co. v. Comm'r of Internal Revenue*, 811 F.2d 1297, 1300 (9th Cir. 1987). Where the insurer and the insured are affiliated entities, often referred to as a "captive insurance" arrangement, *id.* at 1298 n.1, the concern is that the taxpayer may be effectively engaging in "self-insurance" as opposed to paying insurance premiums, *id.* at 1300. On the other side of the transaction, the Internal Revenue Code generally taxes insurance companies on their income like other corporations. *See* I.R.C. §§ 11, 831(a). However, insurance companies (including captive insurers) below a certain size can alternatively elect to exclude a certain amount of premiums received from their taxable income. *Id.* § 831(b). In 2016, the relevant tax year in this case, the maximum premium limit was $1.2 million.[1] *Id.* Under § 831(b), these small insurance companies instead pay taxes only on their investment earnings. *United States v. Dep't of Ins.*, 66 F.4th 114, 118 & n.4 (3d Cir. 2023).

While "captive" insurance generally refers to transactions where the insurer and insured are affiliated entities, *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 176 (2017), "microcaptive" insurance specifically refers to arrangements where small insurance companies provide coverage to an affiliated entity, or group of related companies, while making an I.R.C. § 831(b) election, *see id.* at 179 ("Combining these two concepts—captive insurance companies and the section 831(b) tax advantages for small insurance companies—yields the 'microcaptive.'").[2] Given the affiliation between the insured and captive insurer and the tax benefits that accrue to both entities, microcaptive insurance arrangements can pose a heightened

[1] For taxable years beginning after December 31, 2016, Congress raised the premium limit to $2.2 million and added diversification requirements. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 333, 129 Stat. 2242, 3106–08 (2015). These changes are irrelevant to the 2016 tax year at issue in this case.

[2] Although the instant case involves a microcaptive arrangement, this opinion refers generally to captive and microcaptive insurance and insurers interchangeably.

risk of tax abuse. *See id.* at 179–80 (describing ways in which such arrangements may operate to generate "tax deductions while arguably moving money from one pocket to another"); *CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209, 213 (2021) (describing microcaptive insurance arrangements' "potential for tax evasion"). Despite the IRS's concern for potential abuse, where the microcaptive transaction constitutes real insurance, rather than a loss reserve, the taxpayer is entitled to the deduction Congress elected to provide under the Code. *See CIC Servs.*, 593 U.S. at 213 (noting that "[t]he result is that the money does not get taxed at all," and "for better or worse, [this] is a congressional choice").

### B. Capstone's Purported Premiums and FinServ and PoolRe's Purported Insurance Coverage

The key issue in this case is whether Capstone properly deducted from its taxable income insurance premium payments it made to FinServ Casualty Corporation ("FinServ") and PoolRe Insurance Corporation ("PoolRe"). The answer to that question depends on whether those payments constituted "insurance" premiums that entitle Capstone to the tax benefits it claimed. *See* Pl.'s Mem. of L. in Supp. of Mot. for Summ. J. at 8, ECF No. 181; Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. at 5–6, ECF No. 188.

Capstone, at all relevant times, was owned 49.5 percent by Stewart Feldman, 49.5 percent by Mr. Feldman's wife, Dr. Marla B. Matz, and 1 percent by Capstone Holdings Corp. *See* Decl. of Stewart A. Feldman ¶ 15, ECF No. 180-3. Capstone Holdings Corp., at all relevant times, was owned 50 percent by Mr. Feldman and 50 percent by Dr. Matz. *Id.* ¶ 18. In 2016, FinServ, which was domiciled in and regulated by Anguilla, British West Indies, was owned 61 percent by Dr. Matz and 39 percent by a trust of which Dr. Matz was the trustee. *Id.* ¶¶ 54, 58; Pl.'s Exs. at 276–

77, ECF No. 182-3 (FinServ's register of shareholders);[3] ECF No. 182-4 at 118 (FinServ's Anguilla insurance license). Thus, Capstone and FinServ were corporate siblings—*i.e.*, they shared a beneficial owner.[4]

In 2016, PoolRe was also domiciled in and regulated by Anguilla and was owned by a third party, Stephen Friedman. ECF No. 180-3 ¶ 82 (Feldman Declaration describing lack of common ownership between Capstone and PoolRe); *id.*¶ 79 (describing PoolRe redomiciling to Anguilla in 2009); ECF No. 182-5 at 16 (PoolRe's Anguilla insurance license). But other evidence indicates a potential relationship, though not formal ownership, between PoolRe and FinServ as well as PoolRe and Capstone. For example, Mr. Freidman pledged as collateral on a loan from FinServ to Mr. Friedman "[a]ll shares of common stock of PoolRe." ECF No. 190-5 at 16. And PoolRe's Conflict of Interest Policy identified PoolRe as "a wholly owned subsidiary of Capstone." ECF No. 190-1 at 3. Moreover, one of PoolRe's directors, Robert L. Snyder II, testified at deposition that he provided overlapping and simultaneous consulting services to Capstone during his time as a PoolRe director. Dep. Tr. of Robert Snyder at 11:3–12:25, ECF No. 189-20. Capstone's Summary of Third-Party Reinsurance Programs similarly described PoolRe as a "Capstone-

[3] Each party filed an appendix of exhibits in support of their respective briefs. Specifically, Capstone filed a Statement of Undisputed Material Facts and Appendix of Exhibits. *See* ECF Nos. 180-2, 182–84. After the Court granted Plaintiff's Motion for Leave to File Exhibits Out of Time and to File Replacement Statement of Facts in Support of its Motion for Summary Judgment, *see* ECF No. 185, Capstone filed a replacement version of its Statement of Undisputed Material Facts. *See* ECF No. 187-1. The Government filed a Response in Opposition to Plaintiff's Statement of Undisputed Facts and Exhibit Index. *See* ECF Nos. 189–99. After the Court granted the Government's Motion to File Corrected Exhibits, *see* ECF No. 200, the Government filed corrected versions of Exhibits 52, 160, and 166–67. *See* ECF Nos. 201–03. The Court refers to each party's exhibits by their respective ECF numbers and associated pagination rather than the bates-labeled page numbers.

[4] In 2017, FinServ was merged into A.M.Y. Property & Casualty Insurance Corporation. ECF No. 180-3 ¶ 127.

administered Risk Pool" that "[l]imit[s] [its] pool participants to Capstone-administered companies." ECF No. 190-3 at 2.

Capstone contends that, in 2016, it paid $147,595 in direct premiums to FinServ for 10 insurance policies. ECF No. 180-3 ¶ 96 (Feldman Declaration describing the purported premiums and policies); *see, e.g.*, ECF No. 184-3 at 29 (commercial crime policy). For nine of these policies, FinServ was liable for losses below the attachment point (*i.e.*, "primary coverage"), which was 35 percent of the total direct written premiums and pooled premiums received by FinServ for the year. ECF No. 180-3 ¶¶ 104, 107 (Feldman Declaration describing FinServ's liability for primary coverage below the attachment point, which was 35 percent of FinServ's premiums); *see also* ECF No. 184-3 at 62 (Joint Underwriting Stop Loss Endorsement for the nine policies describing the attachment threshold as 35 percent of the Subject Premiums).

Losses exceeding the primary coverage (*i.e.*, "excess coverage" or "stop-loss coverage") were split between FinServ, which covered 20 percent, and PoolRe, which covered 80 percent. ECF No. 180-3 ¶¶ 105, 107–08, 115 (Feldman Declaration describing the stop-loss coverage PoolRe provided to Capstone and FinServ); *see also* ECF No. 184-3 at 62 (Joint Underwriting Stop Loss Endorsement for the nine policies describing PoolRe's coverage for 80 percent of losses exceeding the attachment threshold subject to a ceiling of 160 percent of the Subject Premiums). PoolRe then ceded its 80 percent share to a quota-share risk pool of 79 participating insurance companies, including FinServ. ECF No. 180-3 ¶¶ 115–17 (Feldman Declaration describing the quota-share risk pool); ECF No. 183-1 at 13–14 (2016 Quota Share Reinsurance Policy's schedule of reinsurers and respective quota shares). Capstone also claims that it paid $92,178 in insurance premiums directly to PoolRe for stop-loss coverage on these nine policies. ECF No. 180-3 ¶ 139

(Feldman Declaration describing Capstone's payment of purported premiums for PoolRe's excess coverage).

FinServ maintained three lines of insurance in 2016, receiving: (1) direct written premiums from policies issued to 10 of its affiliated insureds (including Capstone); (2) payments from PoolRe for risk that PoolRe ceded to FinServ through FinServ's participation in PoolRe's quota-share risk pool; and (3) reinsurance premiums for its participation in vehicle-service contracts ceded from Wesco Insurance Company ("Wesco") through Aria (SAC), Ltd. ("Aria") and PoolRe. *Id.* ¶ 94 (Feldman Declaration describing FinServ's 2016 insurance policies and premiums); ECF No. 182-4 at 198 (FinServ's 2016 income statement indicating FinServ's revenues consisted of direct written premiums, pooled reinsurance, other reinsurance programs, and investment income).

In 2016, PoolRe's business consisted of issuing stop-loss insurance policies, administering a quota-share insurance program, and other insurance activities such as the Wesco reinsurance contracts. ECF No. 180-3 ¶¶ 129–31 (Feldman Declaration describing PoolRe's 2016 premiums); ECF No. 184-10 at 502 (PoolRe's 2016 income statement indicating PoolRe's revenues consisted of direct written premiums, reinsurance, insurance services income, and investment income). Through the stop-loss policies, PoolRe insured other insurers for losses exceeding their primary coverage. ECF No. 180-3 ¶ 130 (Feldman Declaration describing PoolRe's stop-loss coverage); ECF No. 184-3 at 62 (Joint Underwriting Stop Loss Endorsement between FinServ and PoolRe describing PoolRe's stop-loss coverage). PoolRe then ceded this liability to the other insurers participating in the quota-share risk pool. ECF No. 180-3 ¶¶ 110, 115–17, 130 (Feldman Declaration describing PoolRe's quota-share risk pool); ECF No. 184-3 at 64 (Joint Underwriting Stop Loss Endorsement explaining that PoolRe, as the Stop Loss Insurer, "redistributed" its 80 percent of liability for the excess coverage "among the various participating captive reinsurers").

Each insurer assumed a quota-share percentage of the ceded total risk of the combined pool. ECF No. 183-1 at 13–14 (2016 Quota Share Reinsurance Policy's schedule of reinsurers and respective quota shares). One of the insurers in the quota-share risk pool was FinServ. *See id.* at 13 (2016 Quota Share Reinsurance Policy's schedule listing FinServ's quota share as 1.3484 percent).

The Feldman Law Firm LLP ("Feldman Law Firm") acted as the "Servicing Agent" of Capstone and other entities with "overlapping ownership" (the "Operating Entities") under a Shared Services Agreement ("SSA") dated November 2, 1998. ECF No. 184-9 at 44. Mr. Feldman is the managing partner of Feldman Law Firm, which is directly or indirectly owned by Mr. Feldman and Dr. Matz.[5] *See id.* at 52 (SSA signed by Mr. Feldman as "Managing Partner" of Feldman Law Firm); ECF No. 180-3 ¶¶ 1, 99 (Feldman Declaration indicating that, since the early 1990s, he has been a partner of Feldman Law Firm, which is a part of Feldman / Matz Interests, LLP, and owned directly or indirectly by Feldman and Matz). The SSA explained that the Operating Entities "wish[ed] to minimize their respective staffing and to better the quality of [their] services by contracting with Servicing Agent for the performance of administrative duties for the operation of each Operating Entity." ECF No. 184-9 at 44 *see also* Decl. of Paul K. Franks ¶¶ 15–21, ECF No. 180-1 (Feldman Law Firm's controller explaining the operation of the SSA). Pursuant to the SSA, Feldman Law Firm was authorized to issue payments on behalf of Capstone in connection with the administrative services provided, like the premium payments to FinServ and PoolRe at issue here. *See* ECF No. 184-9 at 45–46 (SSA indicating that Feldman Law Firm "may act as the disbursing agent on behalf of the respective Operating Entity" in connection with

[5] As of the date of the SSA, Feldman Law Firm was known as Stewart A. Feldman & Associates, L.L.P. *See* ECF No. 184-9 at 53 (First Addendum to the SSA dated November 3, 2004, indicating that Stewart A. Feldman & Associates, L.L.P. was at that time known as The Feldman Law Firm LLP). For ease of reference, the Court refers to Feldman Law Firm by its current name.

the shared services, including "[a]rranging to have insurance coverage"); ECF No. 180-1 ¶¶ 35–37 (Franks Declaration explaining that Feldman Law Firm paid the $239,733 in premiums to FinServ and PoolRe on Capstone's behalf).

During the relevant time, Capstone served closely held businesses and their owners in the establishment and administration of captive insurance companies. *See* Dep. Tr. of Jeffrey Carlson at 16:8–14, ECF No. 182-1 (Capstone employee Jeffrey Carlson testifying at deposition that "the primary services provided by Capstone . . . were to establish and administer captive insurance companies"); ECF No. 180-3 ¶ 13 (Feldman Declaration explaining that "Capstone['s] focus included providing services to closely held businesses and their owners in the formation, administration, and general implementation of captive insurance arrangements"). FinServ and PoolRe are both Capstone-managed insurers. *See* ECF No. 180-3 ¶ 65 (Feldman Declaration indicating that Capstone was an "administrative co-manager" of FinServ); *id.* ¶ 77 (indicating that "Capstone served as PoolRe's statutory insurance manager for all relevant times"); ECF No. 189-23 at 2 (Capstone Services Agreement "formaliz[ing]" PoolRe, Capstone, and Feldman Law Firm's "prior oral agreements concerning turnkey administrative services arrangements"). All of FinServ's direct insureds were corporate siblings of Capstone. ECF No. 180-3 ¶ 99 (Feldman Declaration indicating that, "[i]n addition to Capstone, FinServ also insured" nine other named insureds, "which were all owned directly or indirectly by Dr. Matz, [Mr. Feldman,] or both"); *see, e.g.*, ECF No. 184-3 at 29 (listing named insureds on FinServ's commercial crime insurance policy). The other insurers participating in PoolRe's quota-share risk pool were all Capstone-managed. *See* ECF No. 190-3 at 2 (Capstone's Summary of Third-Party Reinsurance Programs explaining that PoolRe "[l]imit[s] [its] pool participants to Capstone-administered companies"); ECF No. 180-3 ¶ 133 (Feldman Declaration explaining that "[a]s the manager, Capstone

employed" underwriters, insurance brokers, and actuaries "to support the pool, the Wesco program, and the 79 participating reinsurers").

**C. Procedural History**

Capstone filed its Complaint on February 11, 2021. ECF No. 1. On October 14, 2021, after the Government filed its Answer but before discovery had begun, Capstone filed a Motion for Summary Judgment. ECF No. 22. On November 10, 2021, the Government filed a Motion for Relief Under Rule 56(d) of the Rules of the United States Court of Federal Claims ("RCFC") as to Plaintiff's Motion for Summary Judgment. ECF No. 24. The Court granted the Government's motion and denied Capstone's prior summary judgment motion without prejudice on February 1, 2022, emphasizing that this suit is a de novo proceeding involving a fact-intensive inquiry. *Capstone Associated Servs. v. United States*, No. 21-913, 2022 WL 601379, at *2–3 (Fed. Cl. Feb. 1, 2022). The parties then proceeded to discovery.

On December 15, 2025, after the completion of discovery, Capstone filed its pending Motion for Summary Judgment. ECF No. 180. Capstone argues that it has established as a matter of law that the captive insurance transactions at issue constituted valid insurance under the appropriate legal test because: (1) FinServ and PoolRe were separate corporations rather than shams, ECF No. 181 at 38–41; (2) the transactions between FinServ, Capstone, and PoolRe transferred Capstone's risk, *id.* at 41–42; and (3) FinServ and PoolRe distributed risk, *id.* at 42–44. The Government filed its Response on February 3, 2026, arguing that: (1) FinServ lacked the unrelated risks required for risk-shifting, ECF No. 188 at 20–24; (2) none of FinServ's alleged risk distribution strategies achieved their goals, *id.* at 24–29; (3) PoolRe did not face actual and insurable risk, *id.* at 29–33; (4) FinServ is not insurance in the commonly accepted sense, *id.* at 34–39; and (5) several issues of evidentiary weight, including issues of materiality and credibility, preclude summary judgment, *id.* at 39–42. Capstone filed its Reply in Support of its Motion for

Summary Judgment on March 2, 2026, arguing that the Government's Response failed to establish a genuine dispute of material fact under the applicable legal test. *See* ECF No. 205 at 17–25. The Court heard oral argument on August 11, 2026. The motion is ripe for disposition.

## II. LEGAL STANDARDS

### A. Motions for Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A dispute is genuine when a finder of fact may reasonably resolve a factual issue in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). And a fact is material when it "might affect the outcome of the suit" under the substantive law at issue. *Id.* at 248. "When deciding a summary judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences drawn in the nonmovant's favor." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 671 (Fed. Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see also Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (similar). The Court need not limit its review to materials cited by the moving party. *See* RCFC 56(c)(3). Instead, the Court "has discretion to consider other materials in the record when making its determination." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2721 (4th ed.).

"The moving party carries the burden of establishing its entitlement to summary judgment." *Quapaw Tribe of Okla. v. United States*, 120 Fed. Cl. 612, 615 (2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). Thus, "[t]he party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998) (citing *Calderone v. United States*, 799 F.2d 254, 258 (6th Cir. 1986)); *see also Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998) ("Where the movant has the burden [of

proof], its own submissions in support of the motion must entitle it to judgment as a matter of law."); *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (explaining that a summary judgment movant who also bears the burden of proof must "establish beyond peradventure *all* of the essential elements of the claim or defense" (emphasis in original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986))). Only if the movant succeeds in this initial showing must the nonmovant identify specific facts showing a genuine issue for trial. *See Guzman*, 18 F.4th at 160; *Anderson*, 477 U.S. at 250.

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [factfinder] functions," *Anderson*, 477 U.S. at 255, summary judgment is inappropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom," *Gordon v. Kidd*, 971 F.2d 1087, 1093 (4th Cir. 1992) (quoting *Charbonnages de Fr. v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

**B. Tax Partnership Cases**

Capstone challenges the IRS's adjustments in the November 13, 2020 FPAA, a question subject to de novo review by this Court. *Alpha I, L.P. ex rel. Sands v. United States*, 682 F.3d 1009, 1025 (Fed. Cir. 2012). Accordingly, the Court gives no deference to the factual findings made by the IRS. *Litman v. United States*, 78 Fed. Cl. 90, 107 (2007) (citing *George E. Warren Corp. v. United State*s, 135 Ct. Cl. 305, 314 (1956)). Generally, "the burden is upon the taxpayer to establish the amount of a deduction claimed." *Helvering v. Taylor*, 293 U.S. 507, 514 (1935); *accord Abrahamsen v. United States*, 228 F.3d 1360, 1364 (Fed. Cir. 2000) ("In a tax refund case, the taxpayer bears the burden of establishing the right to a refund."). While "[t]he characterization of a transaction for tax purposes is a question of law," the underlying facts are subject to factfinding. *Salem Fin., Inc. v. United States*, 786 F.3d 932, 940 (Fed. Cir. 2015); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) (explaining that "[t]he general

characterization of a transaction for tax purposes is a question of law" although "[t]he particular facts from which the characterization is to be made are not").

## III. DISCUSSION

To determine whether the payments at issue constituted insurance premiums, the Court must apply binding precedent considering: (1) whether FinServ and PoolRe were separate, valid insurance companies or whether they were shams; (2) whether the transactions under the captive insurance arrangement transferred risk from Capstone to FinServ and PoolRe; and (3) whether FinServ and PoolRe distributed risk. The Court finds that genuine issues of material fact prevent Capstone from establishing that FinServ and PoolRe were not shams as a matter of law. Additionally, genuine issues of material fact regarding risk transfer and risk distribution similarly preclude summary judgment in Capstone's favor.

### A. Under Supreme Court and Federal Circuit Precedent, a Transaction Constitutes Insurance, Rather than Loss Reserves, if the Captive Insurer Is Not a Sham, the Transaction Transfers Risk from the Insured to the Insurer, and the Insurer Distributes Risk.

As an initial matter, the parties dispute the appropriate legal test for evaluating whether payments to a captive insurer constitute insurance premiums for federal income tax purposes. Capstone cites the Federal Circuit's decision in *Ocean Drilling & Exploration Co. v. United States*, 988 F.2d 1135, 1150–51 (Fed. Cir. 1993), which, based on the Supreme Court's decisions in *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941), and *Moline Properties v. Commissioner of Internal Revenue*, 319 U.S. 436, 438–39 (1943), applied a three-part test evaluating: (1) whether the captive insurer is a sham; (2) whether risk is transferred from the insured to the captive insurer; and (3) whether the captive insurer distributes risk. *See* ECF No. 181 at 31. The Government largely relies on cases from the Tax Court, which—similarly interpreting *Le Gierse* and *Moline*—set forth a four-part test: (1) existence of an insurable risk; (2) risk shifting; (3) risk distribution;

and (4) hallmarks of commonly accepted notions of insurance. ECF No. 188 at 6 (citing *Rsrv. Mech. Corp. v. Comm'r of Internal Revenue*, 34 F.4th 881, 904 (10th Cir. 2022); *Avrahami*, 149 T.C. at 190–91).

Since "[t]here can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, [the Federal Circuit], and [the Federal Circuit's] predecessor court, the Court of Claims," *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006), the Court must apply the test articulated by the United States Court of Appeals for the Federal Circuit in *Ocean Drilling*, consistent with the Supreme Court's decisions in *Le Gierse* and *Moline*. *See Ocean Drilling*, 982 F.2d at 1150–51. However, there can also be no dispute that some facts relevant to the *Ocean Drilling* analysis are equally relevant when assessing a captive insurance arrangement under the Tax Court factors, and vice versa. *See id.* at 1151 (noting that the facts found to establish the insurer was not a sham under *Moline* also satisfied the Tax Court's "presence of insurance risk" and "commonly accepted notions of insurance" factors).

The first factor under *Ocean Drilling* requires the Court to analyze the captive insurer's operations and the validity of its business existence. Although related companies must generally "be considered as separate entities in evaluating whether the transactions between the two companies resulted in risk shifting and risk distributing" for purposes of constituting insurance, if "the business operations of [the insurer] are a sham, [its] 'corporate form may be disregarded.'" *Id.* at 1150 (quoting *Moline*, 319 U.S. at 439). To determine whether the captive insurer is a sham, courts look at whether—all facts considered—the insurer was created for a legitimate business purpose and is carrying on a legitimate business activity, or whether it was instead created or is operated for purposes of tax avoidance. *See id.* at 1151 (finding, after trial, that "[s]everal factors contribute to recognizing [the insurer] as a valid insurance company"); *Kidde Indus., Inc. v. United*

*States*, 40 Fed. Cl. 42, 51 (1997) (finding, after trial, that "the totality of the evidence indicates that . . . [the parent insured] had legitimate business reasons for creating a captive insurer subsidiary that had nothing to do with the tax advantages that would result"), *dismissed*, 194 F.3d 1330 (Fed. Cir. 1999). This facts-and-circumstances analysis may consider, among other things, (1) whether the common owner had a legitimate business reason for creating the captive insurer; (2) whether the common owner operated the captive insurer in a manner consistent with a separate, legitimate business; (3) whether the captive insurer had other business unrelated to that of the common owner; (4) the capitalization and financial condition of the captive insurer; (5) whether the insured faced true hazards; (6) whether insurance contracts were written and premiums were paid; (7) whether the market played a role in how the captive insurer determined its premiums; (8) whether the validity of claims were established before payments were made; (9) whether funds were maintained separately; and (10) whether, overall, the captive insurer was operated separately. *Ocean Drilling*, 982 F.2d at 1151; *Kidde*, 40 Fed. Cl. at 51.

Under the second *Ocean Drilling* factor, the court must analyze whether the captive insurance arrangement transferred risk. Risk is transferred when the transaction reduces the insured's variability of loss such that the level of risk that the insured initially transferred exceeds the level of risk it ultimately shoulders. *Ocean Drilling*, 982 F.2d at 1152; *see Le Gierse*, 312 U.S. at 539 ("[I]nsurance involves risk-shifting and risk-distributing[.]"). "The risk to which [this factor] refers is the risk that in the future a corporation will face uncertain and variable claims against it." *Kidde*, 40 Fed. Cl. at 53 (citing *Ocean Drilling*, 988 F.2d at 1151). Risk transfer occurs when that risk shifts from the insured to the captive insurer. *Id.* Because the captive insurer agrees, in return for the receipt of the premium payments, to pay all claims covered under the policy, "in

effect, the insured shifts the risk to the insurer that the total amount of the claims against it (including the costs of processing) will exceed the premium paid." *Id.*

The third factor in *Ocean Drilling* requires determination of whether the captive insurer distributed its risk by spreading the risk among a sufficient number of unrelated policyholders. *Ocean Drilling*, 982 F.2d at 1153; *see Le Gierse*, 312 U.S. at 539. In other words, "[b]y increasing the total number of independent, randomly occurring risks that a [captive insurer] faces . . . , the [insurer] benefits from the mathematical concept of the law of large numbers in that the ratio of actual to expected losses tends to approach one." *Kidde*, 40 Fed. Cl. at 53.

While the Tax Court cases that the Government cites also consider risk transfer and risk distribution, the Tax Court cases additionally analyze whether the captive insurance arrangement involves insurable risks and whether the captive insurer satisfies "commonly accepted notions of insurance," including whether: (a) the captive insurer "was organized, operated, and regulated as an insurance company;" (b) the captive insurer "was adequately capitalized;" (c) the insurance "policies were valid and binding;" (d) "the premiums were reasonable and the result of an arm's-length transaction;" and (e) "claims were paid." ECF No. 188 at 16 (quoting *Rsrv. Mech.*, 34 F.4th at 907). The Federal Circuit did not adopt these Tax Court factors as independent factors in *Ocean Drilling*, but it did acknowledge that some of the same facts relevant to analyzing whether insurable risks exist and whether a captive insurer abides by "commonly accepted notions of insurance" are relevant to the sham analysis under *Moline*. *See* 988 F.2d at 1151; *Kidde*, 40 Fed. Cl. at 51 (analyzing whether the parent insured "had legitimate business reasons for creating a captive insurer subsidiary that had nothing to do with the tax advantages that would result," before analyzing "whether the arrangement . . . is consistent with commonly accepted notions of insurance"). As noted above though, the Tax Court factors are not binding requirements for

establishing insurance in this Court. Instead, the Court must determine whether the premiums Capstone paid to FinServ and PoolRe were insurance under a totality of the circumstances. *See Ocean Drilling*, 988 F.2d at 1150–53; *Kidde*, 40 Fed. Cl. at 51, 56–58; *Moline*, 319 U.S. at 439; *Le Gierse*, 312 U.S. at 539.

### B. Genuine Issues of Material Fact Preclude the Conclusion that FinServ and PoolRe Were Not Shams as a Matter of Law.

#### 1. Genuine Issues of Material Fact Preclude the Conclusion that FinServ Was Not a Sham.

Whether FinServ was a separate, valid insurance company or was instead a sham is a question of fact on which Capstone bears the burden of proof. *N. Ind. Pub. Serv. Co. v. Comm'r of Internal Revenue*, 115 F.3d 506, 512 (7th Cir. 1997) (citing *Bass v. Comm'r of Internal Revenue*, 50 T.C. 595, 602 (1968)). As such, Capstone must affirmatively demonstrate that "no reasonable trier of fact could find other than for the moving party." *Torres Vargas*, 149 F.3d at 35–36 (quoting *Calderone*, 799 F.2d at 258); *see also Quapaw Tribe of Okla.*, 120 Fed. Cl. at 615; *Albee Tomato*, 155 F.3d at 618; *Guzman*, 18 F.4th at 160. Capstone has not met its burden as numerous genuine issues of material fact prevent the conclusion that FinServ was not a sham.

Capstone argues that FinServ was a separate corporation from Capstone and was not a sham because: (1) FinServ maintained adequate capital under Anguilla law and satisfied all Anguilla regulatory requirements; (2) FinServ maintained separate financial accounts, issued written policies that covered recognized risks, relied on third-party quotations and independent actuaries in pricing its policies, and paid and documented claims after determining that the claims were proper; and (3) the IRS did not make any adjustments to FinServ's 2016 tax return after audit. *See* ECF No. 181 at 38–40. While it does not appear that the Government disputes FinServ's corporate legal status, its capitalization, or compliance with Anguilla law, these facts alone are insufficient to establish that FinServ's separate status from Capstone was not a sham. *See Ocean*

*Drilling*, 988 F.2d at 1151 (citing adequate capitalization as but one of "[s]everal factors contribut[ing] to recognizing [the captive insurer] as a valid insurance company"). Moreover, the IRS's previous action regarding FinServ's 2016 tax return—which is not at issue here—is not binding in this de novo proceeding involving Capstone's premium deductions. *See Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 663 (2008) ("The court tries factual issues *de novo* in tax refund suits; no weight is given to the factual findings made by the IRS during administrative proceedings." (citing *George E. Warren*, 135 Ct. Cl. at 314)), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010). Because the Court must assess the totality of the circumstances, Capstone cannot satisfy its burden at the summary judgment stage by relying on a few undisputed or immaterial facts in isolation.

Indeed, there are several genuine disputes of material fact regarding Capstone's payment of premiums, FinServ's processing and payment of claims, and whether FinServ's loans to affiliates support a finding that FinServ was a sham. For example, the Government identifies a genuine dispute of evidentiary fact as to whether Capstone actually paid the purported premiums to FinServ and in what amount. *See* ECF No. 188 at 35–36. To establish that Feldman Law Firm paid FinServ $147,595 in premiums on behalf of Capstone during the 2016 tax year, Capstone relies on a declaration from Feldman Law Firm's controller, Paul Franks, interpreting Feldman Law Firm's general ledger. *See* ECF No. 180-1 ¶¶ 35–38 (Franks Declaration); *id.* at 134–35, 139–40 (excerpts from Feldman Law Firm's general ledger attached to the Franks Declaration). The Government, however, counters with its expert's anticipated testimony that Feldman Law Firm's general ledger does not reflect that the premiums were paid in the manner that Mr. Franks indicates. *See* Decl. of Michael D. Pakter ¶¶ 20–27, ECF No. 189-2.

Further, Feldman Law Firm's general ledger only indicates an aggregate quarterly amount paid from Feldman Law Firm to FinServ on behalf of the SSA signatories—all of which are

Capstone-affiliated companies. ECF No. 180-1 at 134–35, 139–40 (excerpts from Feldman Law Firm's general ledger indicating quarterly payments to FinServ for "captive premium[s]"); *id.* ¶ 38 (Franks Declaration indicating these "represent[] payments made by Capstone and other SSA signatories"); *see also* ECF No. 184-9 at 44 (SSA noting that all signatories have "overlapping ownership" with Feldman Law Firm). Capstone presents no contemporaneous evidence establishing the breakdown of these aggregate payments between the SSA signatories and instead relies on a memorandum to file drafted by Mr. Franks during the course of discovery in this litigation. *See* ECF No. 180-1 at 29 (April 23, 2024 memorandum to file indicating that "[t]he captive insurance premiums were allocated to the operating entities under [the SSA] on an agreed upon allocation of 50% of the costs born[e] by The Feldman Law Firm LLP, 25% by Capstone Associated Services, Ltd., and 25% of the costs by RSL Funding LLC"); *see also id.* ¶ 22 (Franks Declaration explaining that the April 23, 2024 memorandum was produced to the Government on or about April 30, 2024). At deposition, Mr. Franks conceded that the allocations were "determined prior to [his] being there" and that he knew of no other documentation of that determination aside from the memorandum. Dep. Tr. of Paul K. Franks at 19:7–20:12, 33:8–22, ECF No. 189-13. The SSA also does not identify a premium allocation, and the allocation described in Mr. Franks's April 23, 2024 memorandum to file—50 percent to Feldman Law Firm and 25 percent each to Capstone and RSL Funding LLC ("RSL Funding")—is inconsistent with other allocation methods used by the SSA signatories, which were based on per capita and per space calculations. ECF No. 203-25 at 2–3 (2016 Feldman Law Firm Allocation of Expenses).

Taken together, these conflicting pieces of evidence create a genuine factual dispute as to whether Capstone paid premiums to FinServ and in what amount. A reasonable factfinder could find that the Government's expert's testimony regarding Feldman Law Firm's ledger, along with

the ambiguity surrounding the allocation of premiums among the SSA signatories, indicates that Feldman Law Firm did not make the premium payments in the manner in which Capstone claims. *See Anderson*, 477 U.S. at 250 (explaining that a "genuine factual issue" is one that "may reasonably be resolved in favor of either party").

In reply, Capstone argues that the Government does not appear to dispute that Feldman Law Firm received sufficient funds on Capstone's behalf in 2016 to pay the premiums. *See* ECF No. 205 at 28 (citing the United States' Response in Opposition to Plaintiff's Statement of Undisputed Facts at 335–38, ECF No. 199). This argument, however, misses the point, as the Government disputes whether Capstone paid the premiums to FinServ in the amount that Capstone claims and in a manner that reflects that the two companies were engaged in an insurance transaction. *See* ECF No. 188 at 35–36. Thus, even accepting that Feldman Law Firm took in sufficient receipts to pay the premiums on Capstone's behalf, whether Capstone can demonstrate the payment and allocation of the premiums based on Feldman Law Firm's records remains disputed. Further, Capstone's reliance on Mr. Franks's declaration and memorandum to file to establish the premium payments and allocations—rather than contemporaneous documentary evidence—creates credibility issues that the Court cannot resolve at summary judgment. *Anderson*, 477 U.S. at 255. This genuine factual dispute is material as, in conducting *Moline*'s sham analysis, courts consider whether "premiums were paid" and whether such premiums "were based on the commercial rates." *Ocean Drilling*, 988 F.2d at 1151. Accordingly, the conflicting evidence regarding Capstone's payment of premiums to FinServ creates a genuine dispute of material fact precluding summary judgment.

Another genuine issue of material fact exists as to the manner in which FinServ processed and paid claims. Capstone relies on policy and procedure documents (many of which it drafted in

its role as a captive insurance manager) and the Feldman Declaration to demonstrate that Capstone's staff, acting on FinServ's behalf, reviewed claims and established their validity prior to paying them. *See, e.g.*, ECF No. 180-3 ¶ 151 (Feldman Declaration indicating that "[i]n assessing FinServ' s exposure on a claim, Capstone insurance staff would review the claim against the policy and make a recommendation to the insurer and the insured [about whether] coverage exists for the claim and the amount to be paid . . . in accordance with the claims procedure"); ECF No. 184-2 at 9–11 (Capstone Procedures Manual's claims handling procedure); *id.* at 13–16 (Capstone Procedures Manual's "Claims Overview"); ECF No. 184-8 at 282 ("Claims Handling and Processing" document labeled with "Copy: Capstone procedures"). Yet, other documents and testimony suggest that these policies and procedures were not followed in practice. *See* ECF No. 184-8 at 274–75 (FinServ documenting, on Capstone letterhead, the 2016 Ward Creative Communications claim in a single paragraph without any explanation of why the claim was covered by the applicable policies, how the split among policies was determined, what was being paid, or how the amounts were calculated); *id.* at 277–80 (similar documentation for the 2016 Genitempo claim); Dep. Tr. of Stewart A. Feldman (Personal Capacity) at 75:4–76:20, ECF No. 189-11 (Feldman's personal deposition testimony that he is "not sure it matters whether [the Genitempo claim] was a '15 or '16 claim"); Decl. of David L. Eckles, Ph.D. ¶¶ 43–51, ECF No. 189-1 (Government's expert opining that FinServ's claim processing was flawed and inconsistent with FinServ's Capstone-drafted policies and procedures); Dep. Tr. of Daniel Calderon (Rule 30(b)(6) Designee) at 12–13, 17–19, ECF No. 189-7 (deposition testimony of one of Capstone's 30(b)(6) witnesses, Daniel Calderon, inconsistently identifying a claims memorandum to file as either written by Feldman-as-Capstone-the-insured or Feldman-as-Capstone-the-captive-manager).

This competing evidence creates a genuine issue of fact as to the manner in which FinServ processed and paid claims, as a reasonable factfinder could conclude that in practice FinServ's processing and payment of claims, via Capstone's staff, deviated from its policies and procedures, which were also themselves drafted by Capstone, because FinServ did not sufficiently review and verify the validity of claims prior to paying them. Additionally, Capstone's reliance on the Feldman Deposition to establish that Capstone and FinServ followed the procedures contained in the policy documents, alongside the Government's evidence that the companies did not in fact follow the procedures, creates a credibility issue not suitable for resolution at this stage. *Anderson*, 477 U.S. at 255. This genuine dispute is also material. Although Capstone argues that there is no requirement that FinServ have "standardized claims processes," ECF No. 205 at 24, to demonstrate that it was not a sham under *Moline*, courts can and do consider if "[t]he validity of claims was established before payments were made on them."[6] *Ocean Drilling*, 988 F.2d at 1151. Thus, whether and how FinServ established the validity of claims prior to paying them is a genuine dispute of material fact precluding summary judgment.

Finally, there exists a genuine issue of material fact regarding the competing inferences that can be drawn from FinServ's investments. The Government presents facts showing that FinServ's investments consisted of loans: (1) for real property constructively owned by Mr. Feldman and Dr. Matz, ECF No. 190-8 at 3, 8–9 (mortgage loan from FinServ to Mr. Feldman and

[6] Capstone argues that the Government's insistence that FinServ maintain "standardized claims processes" seeks to "invalidate IRC § 831(b) insurance companies based on the proposition that they need to mimic commercial insurance carriers." ECF No. 205 at 24. The Court takes Capstone's point that, in imposing a $1.2 million ceiling on premiums to limit the tax benefit to small insurers, Congress likely did not intend for § 831(b) insurers to mimic large commercial insurers. *See id.* at 13–15. But *Ocean Drilling* recognized that whether a captive insurer verifies the validity of claims before paying them is one factor relevant to *Moline*'s sham analysis. *See* 988 F.2d at 1151. Thus, the Court's finding of a genuine dispute of material fact as to whether FinServ did so does not hold Capstone to an improper standard.

Dr. Matz for property owned by Mr. Feldman, Dr. Matz, and The Feldman Children's Irrevocable Family Trust); ECF No. 190-9 at 3, 8–9 (mortgage loan from FinServ to 2075 Vermont Associates, LLC, signed by Mr. Feldman as manager, for property beneficially owned by Mr. Feldman and Dr. Matz); (2) to Mr. Friedman, the owner of PoolRe, ECF No. 190-5 at 3, 7–8, 16 (loan from FinServ to Mr. Friedman secured by "[a]ll shares of common stock of PoolRe"); and (3) to other affiliated business interests of Mr. Feldman and Dr. Matz, ECF No. 190-4 at 3–8 (loan from FinServ to Feldman Law Firm, RSL Funding, and other Feldman-Matz companies); ECF No. 190-6 at 2–6 (promissory note between FinServ and RSL Funding). The Government maintains that FinServ engaged in "self-dealing" rather than "traditional investments." ECF No. 188 at 36–38. While Capstone correctly argues that there is no genuine dispute as to the fact of FinServ's investments, *see* Oral Arg. Tr. at 35:11–22, ECF No. 208, there is a genuine issue of material fact as to what inferences or conclusions can be drawn from those evidentiary facts in deciding the ultimate issue of whether FinServ was a sham. *See Gordon*, 971 F.2d at 1093 (explaining that summary judgment is inappropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom" (quotation omitted)). In other words, even though there is no genuine dispute as to what investments FinServ made, a reasonable factfinder could conclude either (a) that those investments support the conclusion that FinServ was a sham or (b) that those investments support the conclusion that FinServ is a separate company with a valid business existence.

This genuine issue of fact is also material because FinServ's loans to Mr. Feldman, Dr. Matz, and other related entities could suggest that FinServ was a sham under *Moline*. *See Ocean Drilling*, 988 F.2d at 1141 (noting that the insurer "never loaned money to plaintiff or its subsidiaries"). Although Capstone argues that there is no legal requirement for FinServ to engage

in "traditional investment strategies" and that there is nothing improper about loaning money from one corporate affiliate to another, *see* ECF No. 205 at 23–24, whether the captive insurer's investment activity is consistent with what would be expected in the market, or instead reflects that the captive insurer was a sham, is a factor that a factfinder may consider under *Ocean Drilling*'s broad facts-and-circumstances analysis. *See* ECF No. 208 at 15:10–18 (Capstone's counsel emphasizing that *Ocean Drilling* and *Moline* contemplate "a broad-based analysis . . . of all the facts and circumstances"). Thus, the significance of FinServ's loans to Capstone-affiliated entities and individuals is a genuine issue of material fact.

In light of the foregoing genuine disputes of material fact regarding Capstone's payment of premiums and FinServ's processing of claims, as well as the conflicting inferences and conclusions that can be drawn from FinServ's investments, which consisted of loans to affiliates, Capstone cannot establish that FinServ was not a sham based solely on FinServ's corporate legal status, as well as capitalization and compliance with Anguilla regulations.

2. <u>Genuine Issues of Material Fact Preclude the Conclusion that PoolRe Was Not a Sham.</u>

As with FinServ, Capstone identifies similar facts with respect to PoolRe that purportedly entitle it to summary judgment, specifically that: (1) PoolRe was owned by a third party (Mr. Friedman), maintained adequate capitalization, and satisfied Anguilla regulatory requirements; (2) PoolRe maintained separate financial accounts and issued written insurance policies to unrelated entities; and (3) the IRS accepted PoolRe's 2016 tax return, which it filed as an insurance company.[7] *See* ECF No. 181 at 40–41. Under the totality of the circumstances, however, Capstone has not established, as a matter of law, that PoolRe was not a sham because there are genuine

[7] Like with FinServ, the IRS's previous treatment of PoolRe's tax return is immaterial to establishing that PoolRe was not a sham in this de novo proceeding concerning Capstone's premium deductions. *Stobie Creek Invs.*, 82 Fed. Cl. at 663.

disputes of material fact regarding whether PoolRe, in practice, operated as a separate entity engaged in a legitimate insurance arrangement.

For example, there is a genuine issue of material fact as to how PoolRe calculated the premiums it assessed and whether the market played a role in that determination. The Government argues that there is a circular flow of funds among PoolRe, FinServ, and Capstone. *See* ECF No. 188 at 28–29. Admittedly, there is no genuine dispute as to the amount of premiums PoolRe received and the premiums PoolRe ceded to the quota-share risk pool participants in 2016. *See* ECF No. 184-10 at 502 (PoolRe's 2016 income statement showing it received $28,321,610 in direct written premiums and $11,167,000 in reinsurance assumed from the pooling arrangement while ceding $28,321,610 of the direct written premiums and $11,102,691 of the reinsurance premiums). Yet, there is a genuine dispute as to the inferences and conclusions that can be drawn from the fact that the premiums PoolRe received were nearly identical to the premiums that PoolRe ceded. That is, a reasonable factfinder could infer that PoolRe's premiums were not determined by the market and did not reflect the actual cost of potential risk but instead were strategically set to shift funds in a way that achieved tax avoidance for the entities involved.

Capstone suggests that this dispute is immaterial, as the Government's contention that PoolRe's premiums demonstrate a circular flow of funds relies on the impermissible economic family argument.[8] *See* ECF No. 205 at 21–22; Rev. Rul. 2001-31, 2001-1 C.B. 1348 (indicating

[8] Under the now-rejected economic family argument, the IRS historically maintained that risk could not be shifted or distributed between entities sharing common ownership because the risk remained within the same economic family. *See* Rev. Rul. 77-316, 1977-2 C.B. 53 (finding absence of risk transfer and risk distribution between taxpayer and captive insurer, a wholly-owned subsidiary of the taxpayer, because risk was retained within the economic family); *Clougherty Packing*, 811 F.2d at 1302 (explaining that "the economic family theory appears to treat a corporation and its affiliates as a single overall entity and then assess whether the insurance arrangement shifts the risk of loss away from that entity").

the IRS "will no longer invoke the economic family theory with respect to captive insurance transactions" but may "continue to challenge certain captive insurance transactions based on the facts and circumstances of each case"); *Rent-A-Ctr., Inc. v. Comm'r of Internal Revenue*, 142 T.C. 1, 25 (T.C. 2014) ("Because Rev. Rul. 2001-31 has not been revoked, we could treat the economic family argument as conceded." (Buch, J., concurring)). But the IRS's concession of the economic family argument does not undermine the principle that "the corporate form may be disregarded where it is a sham or unreal." *Moline*, 319 U.S. at 439. And one factor that courts consider in determining whether a captive insurer is a sham is whether it set its premiums based on the market. *See Ocean Drilling*, 988 F.2d at 1151 (finding the fact that premiums "were based on the commercial rates" indicated the captive insurer was not a sham).

To establish that PoolRe's calculated premiums were consistent with what would be expected in the market, Capstone relies on, among other things, a 2018 actuarial report analyzing the stop-loss attachment point. *See* ECF No. 184-6 at 2–11. The Government challenges the applicability and validity of that report for purposes of establishing that PoolRe's premiums were based on commercial rates. *See, e.g.*, Decl. of George Zanjani, Ph.D. ¶¶ 14–23, ECF No. 189-4 (Government's expert describing anticipated testimony that the actuarial analyses Capstone relies upon rested on flawed assumptions and thus do not justify the premiums); ECF No. 189-1 ¶ 23 (Eckles Declaration describing anticipated testimony that PoolRe's premiums and losses "did not exhibit outcomes expected of a properly functioning risk pool"). Capstone also relies on a 2012 report prepared by actuary Steven Glicksman and titled "Discussion of PoolRe's Coverage Options." *See* ECF No. 184-1 at 14–22. But the report indicates that the coverage options were "designed to result in approximately 40.0% to 50.0% of premiums ceded to PoolRe" because PoolRe communicated that "this is considered a desirable range of ceded premiums." *Id.* at 15.

In other words, the report apparently did not set out to determine a premium rate based on the market but instead set out to create coverage options that would result in a specific percentage of ceded premiums PoolRe found to be advantageous. Moreover, Mr. Glicksman stated at deposition that the report was specific to the year 2012 and could not be relied on for the 2016 tax year. Dep. Tr. of Steven Allan Glicksman at 8:4–9:10, ECF No. 189-14. Overall, the conflicting evidence creates a genuine dispute of fact as to whether PoolRe's premiums were actuarially determined for the 2016 tax year because a reasonable factfinder could instead conclude that the premiums were deliberately set to achieve Capstone's desired tax avoidance. This dispute is material because courts consider whether the captive insurer's premiums "were based on the commercial rates" in determining whether the captive insurer is a sham. *Ocean Drilling*, 988 F.2d at 1151.

Likewise, whether PoolRe faced a risk that it would actually be liable to pay out claims is a genuine dispute of material fact. PoolRe's liability was explicitly limited to the amount that each captive invested in the quota-share risk pool. *See, e.g.*, ECF No. 184-3 at 63 (FinServ and PoolRe's Joint Underwriting Stop Loss Endorsement providing that PoolRe's liability "is expressly limited to the amount collected by PoolRe under the reinsurance policy from each of the quota share reinsurers listed" (capitalization omitted)); *see also* ECF No. 189-23 at 12 (Insurance Pool Administration Agreement between Capstone and PoolRe explaining that PoolRe "is acting in the capacity of a facilitator and, . . . does not retain any material liability for coverages"). There also exists a genuine dispute of material fact as to the amount of claims PoolRe paid out prior to 2016. *See* ECF No. 189-20 at 14:3–22 (deposition testimony of Mr. Snyder, one of PoolRe's directors, that he could not recall an instance in which PoolRe had paid a claim prior to 2016); ECF No. 189-4 ¶ 25 & n.25 (Zanjani Declaration noting that the documentary evidence "contain[s] conflicting data on the specific amount of losses paid by PoolRe"); *e.g.*, ECF No. 192-5 at 6 (PoolRe's 2011

income statement showing losses of $59,851). A reasonable factfinder could conclude from the evidence that there was little likelihood that PoolRe would have been liable to pay out claims and that PoolRe only paid out a de minimis number of claims. Such a dispute is material because whether and how a captive insurer could be liable for claims is one fact courts consider in addressing whether a captive insurer is a sham. *See Ocean Drilling*, 988 F.2d at 1151 (finding that the insured faced true hazards and that the captive insurer paid out valid claims from separate funds as facts indicating that the insurer was a not a sham); *see also Le Gierse*, 312 U.S. at 539 (holding that the relevant transaction must involve actual "insurance risk" to constitute insurance).

Similarly, although it is undisputed that PoolRe had a separate corporate legal status, genuine issues of material fact exist as to PoolRe's independence from Capstone. While there is no genuine dispute that Mr. Friedman formally owned PoolRe in 2016, *see* ECF No. 182-5 at 7 (Attachment to PoolRe's Foreign Insurance Company Election Under Section 953(d) listing Mr. Friedman as the 100 percent shareholder of PoolRe), several other facts suggest a relationship between PoolRe and Capstone. For example, Mr. Freidman pledged as collateral on a loan from FinServ "[a]ll shares of common stock of PoolRe." ECF No. 190-5 at 16. And Mr. Snyder, one of PoolRe's directors, testified at deposition that he simultaneously provided "overlapp[ing]" consulting services to Capstone during his time as a PoolRe director. ECF No. 189-20 at 11:3–12:25. A services agreement between PoolRe, Capstone, and Feldman Law Firm further suggests that Capstone possessed extensive control over PoolRe, including the ability to dissolve and liquidate it. ECF No. 189-23 at 7. Indeed, PoolRe's own conflict-of-interest policy described PoolRe as "a wholly owned subsidiary of Capstone." ECF No. 190-1 at 3; *see also* ECF No. 190-3 at 2 (Capstone's Summary of Third-Party Reinsurance Programs describing PoolRe as a "Capstone-administered Risk Pool" that "[l]imit[s] [its] pool participants to Capstone-

administered companies"). The totality of this evidence creates a genuine dispute of fact regarding whether PoolRe and Capstone are unrelated, as Capstone argues, because a reasonable factfinder could conclude that, despite Mr. Friedman's formal ownership, in practice, the two companies did not operate independently. Such a genuine dispute is material as courts conducting a sham analysis consider whether "unrelated parties purchased reinsurance from [the insurer]." *Ocean Drilling*, 988 F.3d at 1151. Therefore, the evidence creates a genuine dispute of material fact as to PoolRe's independence from Capstone, FinServ, and other entities owned by Mr. Feldman and Dr. Matz.

Finally, there is a genuine dispute of material fact as to what amount of risk was ultimately ceded under the Wesco vehicle service contracts. Capstone maintains that PoolRe reinsured third-party vehicle service contracts originating with Wesco, through Aria. ECF No. 180-3 ¶¶ 86–88 (Feldman Declaration describing the purported Wesco contractual liability insurance related to vehicle service contracts assumed by PoolRe). But Capstone has not presented evidence tracing any particular vehicle service contract insurance account from Wesco to Aria to PoolRe. *Compare* ECF No. 184-1 at 40 (November 23, 2010 Reinsurance Treaty Trust Agreement between Aria, Wesco, and Comerica Bank & Trust, N.A. referring to segregated account "SA 063"), *with id.* at 66 (Attachment to January 1, 2015 Coinsurance Contract issued to Aria by PoolRe referencing "SA 010" and "SA 020"); *see also id.* at 73 (Quota Share Reinsurance Agreement issued to Wesco by Aria referencing "SA#19"); *id.* at 89 (Quota Share Reinsurance Agreement issued to Wesco by Aria referencing "SA#63");[9] *id.* at 105 (example of vehicle insurance contract); *id.* at 185

[9] While the Reinsurance Treaty Trust Agreement between Aria and Wesco also referenced SA 63, ECF No. 184-1 at 40, Capstone has not shown that PoolRe ever reinsured or coinsured SA 63, nor any other individual account. *Compare id.* at 70 (Attachment to 2015 Reinsurance Contract between FinServ and PoolRe indicating FinServ reinsured "the 2016 insurance exposures on all policies of vehicle service contracts ceded to [Aria] under its treaty dated January 1, 2015"), *with id.* at 64–66 (indicating that the January 1, 2015 Coinsurance Contract between Aria and PoolRe was expressly limited to SA 10 and SA 20).

(purported excerpt of individual policies in Wesco-Aria risk pool). Without the ability to trace the individual policies from Wesco to Aria to PoolRe, Capstone has not established what amount of risk such contracts ultimately ceded to PoolRe. Further, the Government has offered anticipated expert testimony opining that the arrangement did not transfer any risk. *See* ECF No. 189-1 ¶¶ 28–31 (Eckles Declaration opining that PoolRe's alleged external reinsurance arrangements did not transfer risk); ECF No. 189-4 ¶¶ 28–36 (Zanjani Declaration opining that the Wesco arrangement was not proper reinsurance). Altogether, this creates a genuine issue of fact regarding what extent, if any, the Wesco vehicle reinsurance contracts ceded unrelated third-party risk to PoolRe. This genuine issue of fact is material, as it could change the overall conclusion about whether PoolRe was a sham. *See Ocean Drilling*, 988 F.2d at 1151 (considering whether the captive insurer also insured unrelated third parties in determining whether the insurer was a sham).

In sum, several genuine disputes of material fact prevent Capstone from establishing that PoolRe was not a sham as a matter of law. For instance, there are genuine disputes of material fact regarding whether PoolRe's operations reflected a circular flow of funds, whether the market played a role in how PoolRe calculated its premiums, whether PoolRe faced a risk that it would actually be liable for claims of loss, whether PoolRe was independent from Capstone, and what amount of risk, if any, was ultimately ceded under the Wesco vehicle service contracts.

* * *

As the sham determination is a factual issue on which Capstone bears the burden of proof, the Court cannot grant summary judgment in Capstone's favor unless Capstone has established that, drawing all inferences in the Government's favor, no reasonable factfinder could find in favor of the Government. It has not done so. Rather, as numerous genuine disputes of material fact prevent the Court from concluding that either FinServ or PoolRe was a separate, valid insurance company—rather than a sham. Because Capstone cannot transfer risk to a sham, Capstone's

inability to establish FinServ and PoolRe's separateness as a matter of law is sufficient for the Court to deny Capstone's motion. *See Kidde*, 40 Fed. Cl. at 50 ("If the court determines that the corporate arrangement is a sham, then the inquiry ends and the payments to the captive insurer are treated as nondeductible reserves rather than 'insurance premiums.'").

### C. Genuine Issues of Material Fact Exist Regarding Risk Shifting and Risk Distribution.

Even though the existence of genuine issues of material fact regarding whether FinServ and PoolRe were shams is sufficient to preclude summary judgment, additional grounds support the denial of Capstone's motion because genuine disputes of material fact also prevent the conclusion that the transactions between Capstone, FinServ, and PoolRe transferred, and then distributed, risk. The overall characterization of the transactions is a question of law but the underlying factual issues from which that characterization is made are subject to factfinding. *See Salem Fin.*, 786 F.3d at 940; *Frank Lyon*, 435 U.S. at 581 n.16; *Rent-A-Ctr.*, 142 T.C. at 38 ("Whether the facts and circumstances, evaluated in the aggregate, give rise to 'insurance' presents a question of proper characterization. It is thus a mixed question of fact and law." (Lauber, J., dissenting)).

1. <u>Genuine Issues of Material Fact Preclude Summary Judgment on the Issue of Risk Transfer.</u>

To determine whether risk shifting has occurred, courts consider whether "the risk ultimately shouldered by the [insured] is less than the risk transferred" to the insurer. *Kidde*, 40 Fed. Cl. at 57 (citing *Ocean Drilling*, 988 F.2d at 1152–53). For purposes of this factor, the relevant risk is the insured's risk of variability of future loss, and the Court's analysis of whether that risk was transferred from the insured to the captive insurer is based on the transaction as a whole. *See Le Gierse*, 312 U.S. at 539–41. Here, numerous genuine disputes of material fact

prevent the conclusion that a reasonable factfinder could only find in Capstone's favor on the issue of risk transfer.

For example, there is a genuine dispute of material fact as to whether FinServ would have been reimbursed by PoolRe in all realistic loss scenarios. As previously discussed, although there is no genuine dispute as to the circumstances that dictated when PoolRe would be required to pay a claim, there is a dispute regarding the inferences and conclusions that can be drawn therefrom. *See supra* § III.B.2; *see also* ECF No. 184-3 at 63 (FinServ and PoolRe's Joint Underwriting Stop Loss Endorsement providing that PoolRe's liability is expressly limited to the amount each insurer pays for its quota share reinsurance premiums); ECF No. 189-23 at 12 (Capstone and PoolRe's Insurance Pool Administration Agreement indicating PoolRe, as a facilitator, retained no material liability for coverages). Moreover, there is a genuine evidentiary dispute regarding which claims PoolRe paid out prior to 2016. *See* ECF No. 189-20 at 14:3–22 (Mr. Snyder's deposition testimony that he could not recall any time when PoolRe had paid a claim before 2016); ECF No. 189-4 ¶ 25 & n.25 (Zanjani Declaration opining that the conflicting documentary evidence indicates PoolRe only paid out a minimal number of claims); ECF No. 192-5 at 6 (PoolRe's 2011 income statement showing losses of $59,851). Just as these facts create a genuine dispute regarding whether PoolRe was a sham, the same facts lead to a genuine dispute of material fact as to whether risk was ultimately transferred from FinServ to PoolRe (and thus from Capstone to FinServ). *See Le Gierse*, 312 U.S. at 540–41 (finding risk shifting was not present where annuity "counteracted" life insurance policy and thus "neutralize[d] the risk"); *Ocean Drilling*, 988 F.2d at 1152 ("If the level of risk plaintiff initially had transferred and the level of risk plaintiff ultimately had shouldered were virtually the same, plaintiff's risk effectively would not have transferred."); *Steere Tank Line Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978) (finding no risk transfer where claims

would only be paid up to the amount of premiums); *cf. R.V.I. Guar. Co., Ltd. & Subsidiaries v. Comm'r of Internal Revenue*, 145 T.C. 209, 225–26 (2015) (finding risk transfer where the insurer "not only was financially capable of satisfying claims made against it, but it in fact paid such claims" (quoting *Harper Grp. & Includible Subsidiaries v. Comm'r of Internal Revenue*, 96 T.C. 45, 59 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992))).

Thus, in addition to Capstone's failure to demonstrate that the undisputed material facts establish both FinServ and PoolRe were not shams, Capstone is not entitled to summary judgment given the existence of genuine disputes of material fact regarding risk shifting.

2. Genuine Issues of Material Fact Preclude Summary Judgment on the Issue of Risk Distribution.

Additional genuine disputes of material fact prevent the conclusion that the transactions distributed risk as a matter of law. Insurers distribute risk by "spreading the risk of loss among policyholders." *Ocean Drilling*, 988 F.2d at 1153. Put differently, "[b]y increasing the total number of *independent*, *randomly occurring* risks that a[n] [insurer] faces . . . , the [insurer] benefits from the mathematical concept of the law of large numbers in that the ratio of actual to expected losses tends to approach one." *Kidde*, 40 Fed. Cl. at 53 (emphasis added). Accordingly, to be entitled to summary judgment, Capstone must establish that the undisputed material facts demonstrate that FinServ and PoolRe's "amount of unrelated business sufficiently spreads risk so as to constitute risk distribution." *Ocean Drilling*, 988 F.2d at 1153. Capstone, however, has not made such a showing. Instead, at a minimum, the record reflects numerous factual disputes surrounding whether FinServ's other insureds constitute unrelated risks and whether any such amount of unrelated risk was sufficient to constitute risk distribution under the circumstances.

While Capstone contends that it has established risk distribution as a matter of law because FinServ and PoolRe's percentages of unrelated business in 2016 exceeded those found to distribute

risk in *Ocean Drilling*, 988 F.2d at 1153, this argument both rests on an overly broad reading of *Ocean Drilling* and ignores genuine disputes of material fact regarding whether the other risks that FinServ and PoolRe insured were independent from Capstone. First, *Ocean Drilling* did not hold that 44 percent of unrelated business is sufficient, as a matter of law, to establish risk distribution. Instead, the Federal Circuit affirmed the lower court's finding, after trial, that risk distribution was present under the circumstances of that case, which included the fact that the captive insurer's unrelated business constituted between 44 percent and 66 percent of the captive insurer's overall business during the years at issue. *See id.*; *see also* ECF No. 208 at 28:5–23 (Capstone's counsel conceding at oral argument that "there is no magic number" of unrelated business that demonstrates risk distribution because the inquiry is instead based on the "facts and circumstances").

Second, there are genuine issues of material fact regarding whether the other risks that FinServ and PoolRe insured, and which Capstone claims are unrelated, were truly independent and randomly occurring such that they would distribute risk. As one example, there is a genuine dispute of material fact regarding whether FinServ's policies were spread among independent and randomly occurring risks as many, if not all, of FinServ's insureds were located in Houston, Texas (with some even in the same office building), and shared or contracted the same employees. *See* ECF No. 180-3 ¶ 99 (Feldman Declaration explaining that POC Lease Holdings, LLC, a named insured of FinServ, was the landlord for Capstone and other related companies at a shared office); *id.* ¶ 174 (noting that "all companies [under the SSA] operat[ed] under the same master office lease"); *id.* ¶ 64 (indicating Capstone was "an administrative co-manager" of FinServ); *id.* ¶¶ 120–21 (explaining that "Capstone's internal underwriters" in addition to "independent third-party underwriters" hired by "Capstone's staff" assisted in pricing FinServ's policies).

The fact that the companies shared the same office and employees means that a reasonable factfinder could conclude that they do not represent unrelated risks. For instance, if an employee who works for multiple policyholders is unavailable due to a covered loss, that covered loss affects multiple policyholders. *See* ECF No. 208 at 56:6–25. This dispute is material to establishing risk distribution because Capstone must demonstrate that FinServ spread risk among a sufficient number of independent, randomly occurring risks. *Ocean Drilling*, 988 F.2d at 1153; *Kidde*, 40 Fed. Cl. at 53. Thus, there is a genuine dispute of material fact regarding whether FinServ's insureds constitute independent risks given their common geographic location and shared employees.

The existence of genuine disputes of material fact regarding whether FinServ and PoolRe distributed risk among their insureds precludes summary judgment in Capstone's favor. For this additional reason, Capstone's motion must be denied.

## IV. CONCLUSION

For the foregoing reasons, Capstone's Motion for Summary Judgment (ECF No. 180) is **DENIED**. The parties shall submit a joint status report proposing a schedule for further proceedings **by no later than October 16, 2026**.

**SO ORDERED.**

Dated: September 25, 2026

*/s/ Kathryn C. Davis*
KATHRYN C. DAVIS
Judge